UNITED STATES BANKRUPTCY COURT

DISTRICT OF NEW MEXICO

In re:

JENNIFER PATRICIA MULLER,                                 No. 15-10055 ta7

    Debtor.

RON G. BUSTOS and
BUSTOS, LLC,

    Plaintiffs,

v.                                                                        Adv. No. 15-01031

JENNIFER PATRICIA MULLER,

    Defendant.

## MEMORANDUM OPINION

Before the Court is Ron Bustos' (together with Bustos, LLC, the "Plaintiff") request that the debt owed to him be declared nondischargeable under § 523(a)(2)(A),[1] and that Defendant's discharge be denied under §§ 727(a)(3), (a)(4), and/or (a)(6). After a trial on the merits, the Court rules against Plaintiff on all claims.

                I.         FINDINGS OF FACT[2]

The Court finds:

Defendant is a high school graduate who currently works for a home healthcare provider. Her father, Everisto Muller ("Muller"), was a skilled contractor who specialized in framing.

---

[1] Unless otherwise noted, all statutory references are to 11 U.S.C.
[2] To the extent any finding of fact is construed as a conclusion of law, it is adopted as such, and vice versa. The Court may make additional findings of fact and conclusions of law as it deems appropriate.

Muller retired from general contracting in 2004 for health reasons.[3] Cynthia Richards ("Richards"), Defendant's domestic partner, was a banker with 32 years' experience in loan reviews, loan workouts, and regulatory compliance.

From about 2001 to 2011, Defendant dabbled in home remodeling. Sometimes she would buy cheap or distressed houses to remodel and "flip." Other times she would charge others a fee for remodeling work. Her remodeling was limited to light repairs such as painting or tile flooring installation. For the houses she bought and resold, Defendant would hire subcontractors to make any repairs she could not do herself. In general, the properties she flipped were worth $100,000 or less. Muller helped Defendant from time to time.

Defendant's remodeling business was most active between 2004-2007, when she bought, remodeled, and "flipped" between six to ten houses, usually in conjunction with friends or business acquaintances. Defendant borrowed money to buy and remodel the houses through real estate contracts and bank loans. In 2008 banks substantially tightened their lending so Defendant had to curtail her business. However, she continued to offer remodeling services to others.

Around 2005, Robert and Debra Weber bought several vacant lots in Rio Rancho. They approached Defendant and asked for leads on potential buyers.[4] Defendant referred them to her cousin David Chavez, who ended up buying several lots. Defendant was not paid for the referral and did not invest in the lots. She had little to no contact with the Webers after 2012.

---

[3] Muller has a form of palsy and requires constant care. By 2007, his ability to walk had deteriorated significantly; he later became confined to wheelchair. Currently, Muller receives social security and a $270 monthly pension from a carpenters' union.

[4] Defendant had prior dealings with the Webers. Defendant bought and remodeled 3-4 houses with the Webers between 2004 and 2006. They bought the properties' together, remodeled them, and sold them. They did not have a written agreement.

By 2011, Defendant's remodeling activities had dropped significantly. Her mother was in a car accident on September 28, 2010, and was hospitalized. Her father required full time care. Defendant and her siblings divided the duties of caring for their parents. Instead of buying or remodeling houses, Defendant began taking jobs to support herself and her family, including selling advertising and working for a home healthcare agency.

Defendant did not keep bookkeeping records or receipts for her remodeling business. When preparing her tax returns Defendant would rely on any 1099s she got from customers, her bank and credit card statements, and her memory. Not surprisingly, Defendant's tax returns were not completely accurate.

Plaintiff and Defendant met in high school. Plaintiff is a retired deputy fire chief who has been "flipping" houses for twenty years. He currently works in the air national guard, overseeing airplane maintenance. Plaintiff's remodeling business is reasonably successful.

The dispute at issue arose out of an alleged 2004 oral agreement between the parties. Plaintiff sold Defendant a house in 2004, which Defendant remodeled and "flipped." She paid Plaintiff the agreed-upon purchase price when she sold the house. According to Defendant, that was the sum and substance of their agreement. Plaintiff, on the other hand, alleges the following material terms of an oral contract:

- The parties to the agreement were Plaintiff, Defendant, Muller, and Richards;
- Plaintiff sold three houses to Defendant and/or her friends for below-market prices, so Defendant could net around $100,000 in profits when the houses were remodeled and resold. This money would provide start-up capital for Defendant's remodeling/flipping business;
- In exchange, Defendant and Muller agreed to help Plaintiff build a "million dollar" house in the Oxbow neighborhood of Albuquerque; and
- Richards agreed to use her position and connections at the bank where she worked to help Plaintiff find bargain houses to buy and remodel.

These vague, weird, unenforceable, and partially illegal[5] terms were never put in writing. There was no credible evidence that Muller or Richards were parties to such an agreement, and the Court is skeptical whether Defendant was either.

Nevertheless, in 2007 Plaintiff sued Defendant, Richards, and Muller in state court for breach of the alleged oral agreement. The state court judge entered summary judgment against Plaintiff on the Richards claim. Plaintiff appealed.

On July 6, 2011 the parties settled the lawsuit. The settlement was memorialized in writing on September 14, 2011. Under the agreement, Plaintiff agreed to dismiss his claim against Muller and drop his appeal. In return, Defendant agreed to pay Plaintiff $30,000 by October 15, 2011, and an additional $20,000 before March 15, 2012.

Defendant had little or no money when she agreed to pay Plaintiff $50,000. She testified that she intended to raise the funds either by obtaining a construction loan to remodel a house she would find, or else by buying a house, remodeling it, and selling it at a profit. Realistically, neither alternative could be accomplished in 30 days or anything close to it. Defendant did not tell Plaintiff that she was broke, nor disclose her plan for raising money. Had she done so, Plaintiff likely would not have agreed to the settlement.

Plaintiff testified that during the settlement mediation, Defendant told him she had vacant lots she could sell, and also that she also could borrow against her house to pay the settlement amount. Defendant denied making either statement. The Court finds Defendant's testimony more credible on this point.

---

[5] Richards could not have agreed to the terms Bustos outlined without violating state and federal banking laws and breaching her duties to her bank employer. Richards testified persuasively and credibly that she would not and did not make any such agreement.

Defendant did not make any of the payments required under the settlement agreement. In September, 2013 Plaintiff sued to enforce the agreement and obtained a default judgment. He filed a judgment lien on Defendant's house and began foreclosure proceedings in November or December of 2014.

On November 25, 2014, the Webers conveyed a vacant Rio Rancho lot to Defendant. Defendant did not know of the conveyance until Plaintiff discovered it as part of his trial preparation.

Defendant filed this bankruptcy case on January 12, 2015. Her bankruptcy schedules did not list the Rio Rancho lot or an inoperable 1994 Toyota Tacoma pickup truck.

On February 24, 2015, Defendant stipulated to a Rule 2004 examination order, which included a requirement to produce certain documents.[6] Defendant produced documents to Plaintiff on March 3, March 19, March 31, and April 3, 2015. Defendant produced her tax returns[7], most of her bank statements, and statements from one or two credit cards.

Defendant obtained some of the required bank statements from US Bank, Bank of the West, and First Citizen Bank. She paid bank fees to get the copies, and paid hundreds of dollars in copy charges. Ultimately, she produced all of her Bank of the West statements, 15 months of her First Citizens Bank statements,[8] and most of her US Bank account statements. Due to coping errors and apparent sloppiness, not all monthly statements were produced.

---

[6] The document request included 2012-2015 tax returns, two years of bank statements, pay stubs from her employer, and six months of credit card statements.

[7] She produced here 2012 and 2013 income tax returns. She had not yet filed her 2014 tax return when Plaintiff examined her, and of course the 2015 return would not have been due for another year.

[8] There was very little activity in this account

However, in the state court lawsuit, Defendant produced about 300 pages of documents to Plaintiff, including tax returns, HUD settlement statements, check copies, deeds, construction mortgages, closing documents, and claims of liens.

Defendant's financial condition and business transactions can be adequately determined from the documents she produced. The documents make it quite clear that Defendant has had a relatively low income for some years, operated a small remodeling business that was only marginally profitable, and lives modestly. There is no unexplained loss of assets; Defendant has never had any wealth to speak of.

On March 23, 2015, Defendant amended her schedules to include the vacant lot, which she valued at $2,000, and the Toyota pickup truck, valued at $325. The chapter 7 trustee declined to administer these assets. There is some evidence that the lot is encumbered by unpaid real estate taxes, substantially reducing or eliminating its value.

On March 30, 2015, Plaintiff initiated this adversary proceeding.

## II. DISCUSSION

### A. § 523(a)(2)(A) (False Representation / False Pretenses).

Section 523(a)(2)(A) excepts from a debtor's general discharge any debt "for money, property, services, or an extension, renewal, or refinancing of credit, to the extent obtained by - false pretenses, a false representation, or actual fraud . . . ." Plaintiff does not claim any fraud in connection with the alleged 2004 oral agreement. Rather, Plaintiff asserts that Defendant induced

him to sign the settlement agreement with false representations or false pretenses.[9]  Plaintiff asserts that had he known the truth about Defendant's inability to pay and intent not to pay the settlement amount, he never would have signed the agreement.

       1.    <u>False Representation Claim</u>.  To establish a claim for false representation, "the claimant must prove by a preponderance of the evidence that:

- debtor made a false representation;
- with the intent to deceive the creditor;
- the creditor relied on the false representation;
- the creditor's reliance was [justifiable];" and
- the representation caused the creditor to sustain a loss.

*Bank of Cordell v. Sturgeon (In re Sturgeon)*, 496 B.R. 215, 222 (10th Cir. BAP 2013).  *See also Johnson v. Riebesell (In re Riebesell)*, 586 F.3d 782, 789 (10th Cir. 2009).  "False representations are 'representations knowingly and fraudulently made that give rise to the debt.'"  *Adams Cnty. Dept. of Soc. Services v. Sutherland–Minor (In re Sutherland–Minor),* 345 B.R. 348, 354 (Bankr. D. Colo. 2006) (quoting *Cobb v. Lewis (In re Lewis),* 271 B.R. 877, 885 (10th Cir. BAP 2002)). The Court finds that Defendant did not make any false express representations to Plaintiff.  To the extent Plaintiff's § 523(a)(2)(A) claim is based on false representations, it fails.

       2.    <u>False Pretenses Claim</u>.  The elements of a false pretenses claim are substantially similar to claims based on false representations, except that instead of an express

---

[9] Plaintiff also relied on the "actual fraud" prong of § 523(a)(2)(A).  A debtor engages in actual fraud when she "intentionally engages in a scheme to deprive or cheat another of property or a legal right."  *Diamond v. Vickery (In re Vickery),* 488 B.R. 680, 690 (10th Cir. BAP 2013) (quotation omitted).  Plaintiff did not introduce any evidence of actual fraud at trial, so the Court will not address the argument.  In any event, any "actual fraud" claim would be resolved in Defendant's favor because of Plaintiff's failure to prove any loss, as discussed below.  *See Vickery*, 488 B.R. at 691-92 (under actual fraud, plaintiff must show damages or loss caused by the actual fraud).

representation, the debtor made implied misrepresentations meant to create or foster a false impression. *In re Valdez*, 2007 WL 1160357, at *4 (Bankr. D.N.M. 2007).

      a.    <u>Implied Misrepresentation of Intent to Pay</u>.  By signing the settlement agreement, Defendant impliedly represented that she intended to pay as agreed. *See generally In re Kukuk*, 225 B.R. 778 (10th Cir. BAP 1998); Restatement (Second) of Torts, § 530, cmt. c (representation of intent to perform is "normally merely implied from the making of the agreement."). An implied representation of intent to repay will be fraudulent if the debtor had no such intent when the debt was incurred. *Kukuk*, 225 B.R. at 786. "A promise to pay made with a *present intention* not to perform . . . will satisfy the misrepresentation requirement." *In re Brzakala*, 305 B.R. 705, 711 (Bankr. N.D. Ill. 2004) (emphasis in original); *accord In re Slade*, 471 B.R. 626, 640 (Bankr. D.N.M. 2012).

  "[S]ince a debtor will rarely admit a lack of intention to repay, such intent must be inferred by the totality of the circumstances of the case at hand." *Kukuk*, 225 B.R. at 786 (citing *Fowler Bros. v. Young (In re Young)*, 91 F.3d 1367, 1375 (10th Cir. 1996).

A mere failure to perform by itself does not establish fraudulent intent not to perform on an agreement. *See generally Kukuk*, 225 B.R. at 785-86 (10th Cir. BAP 1998); *In re Carlson*, 2008 WL 8677441, at *3 (10th Cir.) ("a finding of fraud [under § 523(a)(2)(A)] cannot be premised upon a mere breach of contract"). However, a certainty of not having funds available to perform, or complete inability to perform, is probative. *See* Restatement (Second) of Torts, § 530, cmt. d. (proof of intent of promisor not to perform may not be based solely on nonperformance, but may be based on certainty that she would not have funds to carry out the promise).

Based on the totality of the circumstances, including Defendant's complete inability to perform, her motivation to get Muller and Richards dismissed, and her implausible schemes for

raising the needed $50,000, the Court finds that Defendant had no intention of paying Plaintiff as agreed when she signed the settlement.

      b. <u>Intent to Deceive</u>. The record also supports the conclusion that Defendant intended to deceive Plaintiff so he would sign the settlement agreement. *See Kukuk*, 225 B.R. at 784 ("The fraudulent nature of the representation is distinct from an intent to deceive to influence another conduct's, the latter being a separate element necessary to liability…"). "The second element of § 523(a)(2)(A), the debtor's intent to deceive the creditor in making false representations to the creditor, may be inferred from the totality of the circumstances." *In re Young*, 91 F.3d 1367, 1375 (10th Cir. 1996) (quotation omitted). Defendant apparently signed the settlement agreement so Richards and Muller would be released. To achieve that goal, Defendant intended to deceive Plaintiff into believing that she intended to, and would, pay him $50,000.

      c. <u>Justifiable Reliance</u>. "In determining whether a creditor's reliance was justifiable, a court should . . . examine 'the qualities and characteristics of the particular plaintiff, and the circumstances of the particular case, rather than [applying] a community standard of conduct to all cases.'" *In re Riebesell*, 586 F.3d 782, 792 (10th Cir. 2009) (quotation omitted). "The Restatement expounds upon justifiable reliance by explaining that a person is justified in relying on a representation of fact although he might have ascertained the falsity of the representation had he made an investigation." *Field v. Mans*, 516 U.S. 59, 70 (1995) (quotation omitted).

"Although justifiable reliance does not require the creditor to prove that she acted consistent with ordinary prudence and care, the creditor must still use her senses and make a cursory examination or investigation of the facts." *In re Larranaga*, 2011 WL 1344562, *5-6 (Bankr. D.N.M. 2011). However, a person is justified in relying on a representation even though

-9-
Case 15-01031-t    Doc 35    Filed 05/19/16    Entered 05/19/16 15:57:28 Page 9 of 18

an investigation could have shown the representation to be false, if there were no "red flags" to prompt an investigation. *Field v. Mans*, 516 U.S. 59, 71-2 (1995).

Plaintiff signed the settlement agreement in reliance on Defendant's implied representation that she would pay him as agreed. He had no reason to think otherwise. The Court finds Plaintiff's reliance justifiable.

          d.     <u>Loss</u>. Finally, Plaintiff must show that his reliance on Defendant's false pretense proximately caused him a loss. *See In re Slade*, 471 B.R. 626, 642 (Bankr. D.N.M. 2012) (misrepresentation must be the proximate cause of the loss); *US v. Spicer*, 57 F.3d 1152, 1160 (D.C. Cir. 1995) ("Section 523(a)(2)(A) says that debts 'for money [or] property ... *to the extent* obtained by' fraud are nondischargeable. Thus only that portion of a debt attributable to the debtor's fraud is nondischargeable.") (emphasis in original). *See also Sanchez v. Martinez*, 653 P.2d 897, 902-03 (N.M. App. 1982) ("A party seeking to recover damages has the burden of proving the existence of injuries and resulting damage with reasonable certainty").

Plaintiff did not prove he lost money by signing the settlement agreement. He had no colorable claims against Richards or Muller. Releasing the worthless claims did not damage him. *See, e.g., Held v. Kaufman*, 694 N.E. 2d 430 (N.Y. 1998) ("Where the underlying claim has no viability, there is no potential for recovery for fraud in the inducement of settlement because plaintiff would not able to show any injury by reason of abandonment of an entirely valueless claim") (citing *Urtz v. New York Cent.*, 95 N.E. 711 (N.Y. 1911).

Plaintiff also had a very weak contract claim against Defendant, who almost certainly was judgment proof when the settlement was signed. The settlement agreement liquidated his claim against Defendant at $55,000[10] and provided an easy mechanism for turning the debt into a

---

[10] This figure includes a $5,000 penalty for failing to pay the second payment ($20,000) timely.

judgment. It is hard to see how Plaintiff was harmed by the settlement. Because of these and other facts in the record, the Court cannot determine how much, if anything, Plaintiff lost when he signed the settlement agreement based on Defendant's false pretenses. The Court suspects Plaintiff lost nothing, and likely benefitted because he did not spend attorney fees pursuing worthless or uncollectible claims.

An analogous line of cases yields the same result. In *Living Designs, Inc. v. E. I. Du Pont de Nemours and Co.*, 431 F.3d 353, 368-369 (9th Cir. 2005), the Ninth Circuit held that when settlements are induced by misrepresentation, a party incurs a loss when "knowledge of the withheld evidence on the date of settlement would have increased the settlement value of the case.…" Similarly, in *DiSabatino v. U.S. Fidelity & Guar. Co.*, 635 F. Supp. 350 (D. Del. 1986), the district court held that, in a fraudulent settlement case,

> After the trier of fact has determined the probable amount of settlement in the absence of fraud after considering all known or foreseeable facts and circumstances affecting the value of the claim on the date of settlement, the amount in settlement already received should be deducted from this total amount.

635 F. Supp. at 355, citing *Automobile Underwriters, Inc. v. Rich*, 222 Ind. 384, 53 N.E.2d 775, 777 (1944). Plaintiff presented no evidence that he would have recovered more had he known Defendant could not pay the settlement as agreed. Plaintiff did not prove any loss.

B. § 727(a)(3) (Failure to Keep or Preserve Records).

Section 727(a)(3) entitles debtors to a discharge unless "the debtor has… failed to keep or preserve any recorded information… from which the debtor's financial condition or business transactions might be ascertained, unless such act or failure to act was justified under all circumstances." "The long-standing rule in the Tenth Circuit is that: 'Records need not be so complete that they state in detail all or substantially all of the transactions taking place in the course of the business. It is enough if they sufficiently identify the transactions that intelligent inquiry

can be made respecting them.' " *In re Stewart,* 263 B.R. 608, 615 (10th Cir. BAP 2001), *aff'd,* 35 Fed. Appx. 811 (10th Cir. 2002) (quoting *Hedges v. Bushnell,* 106 F.2d 979, 982 (10th Cir. 1939)). "Whether the records are sufficient lies within the Court's discretion." *In re Splawn*, 376 B.R. 747, 758 (Bankr. D.N.M. 2007).

A plaintiff has the burden of making a *prima facie* case that the debtor "failed to maintain and preserve adequate records and that the failure made it *impossible* to ascertain [her] financial condition and *material* business transactions." *Gullickson v. Brown* (*In re Brown)*, 108 F.3d 1290, 1295 (10th Cir. 1997) (emphasis in original). The debtor then has the burden to justify her failure to maintain records. *In re Stewart*, 263 B.R. 608, 615 (10th Cir. BAP 2001), *aff'd*, 35 F. App'x 811 (10th Cir. 2002). "[C]reditors should not be required to speculate about the financial condition of the debtor or hunt for the debtor's financial information." *In re Guenther*, 333 B.R. 759, 765 (Bankr. N.D. Tex. 2005).

Here, Plaintiff alleges that Defendant failed to keep or preserve adequate records or her remodeling/flipping business, and also failed to keep and produce her bank and credit card statements. Plaintiff has the burden of showing "which records are missing or why their absence prevented him from understanding [Defendant's] financial condition." *In re Dennis*, 330 F.3d 696, 703 (5th Cir. 2003); *In re Devaul*, 318 B.R. 824 (Bankr. N.D. Ohio 2004).

It is not clear Plaintiff made his prima facie case with respect to the remodeling business records. There is no doubt Defendant's business recordkeeping was abysmal. That business, however, largely was inactive by the time Defendant filed her bankruptcy case. According to Defendant's income tax returns, she made $1,642 from her remodeling business in 2012 and $10,852 in 2013. Defendant testified that the business had little activity in 2014. Defendant's remodeling business records are not needed to determine her financial condition, nor to investigate

any material business transactions. *See, e.g., In re Belonzi*, 476 B.R. 899, 905 (Bankr. W.D. Pa. 2012) ("In some cases, a business may be so small that very little or no records are required to be kept.").

Also unclear is whether Plaintiff made his prima facie case with respect to Defendant's bank and credit card statements. Creditors are entitled to such records, and Defendant did not produce all of them, even though it is apparent they are all available. *See In re Devani*, 535 B.R. 26, 32 (Bankr. E.D.N.Y. 2015) ("[T]he debtor is not required to keep an impeccable system of bookkeeping or records so complete that he can satisfy an expert in business, but is required to produce sufficient records from which the court and the creditors can gain an accurate and complete picture of his finances."); *In re Hobbs*, 333 B.R. 751, 757-58 (Bankr. N.D. Tex. 2005) (to the same effect); *In re Shah*, 388 B.R. 23, 32 (Bankr. E.D.N.Y. 2008) (same).[11] Courts have generally allowed consumer debtors to satisfy the keep or preserve requirement of § 727(a)(3) if they contacted their banks or credit card companies to get copies of the records, and provided them to the creditor requesting the records. *In re Wells*, 426 B.R. 579, 597 (Bankr. N.D. Tex. 2006). Thus, while it would have been much preferable for Defendant to have produced *all* of the requested bank and credit card statements, the Court finds that Defendant's financial condition and material business transactions can be ascertained from the documents that were produced.

Further, whether or not Plaintiff made his prima facie case, Defendant carried her burden of justifying her failure to keep or produce records under the circumstances. "In order to determine

---

[11] Failure to file income tax returns is a factor the Court can consider in connection with a § 727(a)(3) claim. *In re Capponi*, 508 B.R. 908, 927 n.18 (Bankr. E.D. Pa. 2014); *Wachovia Bank v. Spitko (In re Spitko),* 357 B.R. 272, 310 (Bankr. E.D. Pa. 2006); *In re Claybrook*, 385 B.R. 842, 852 (Bankr. E.D. Tex. 2008), *aff'd sub nom. Claybrook v. Bell*, 2008 WL 4646929 (E.D. Tex. 2008) (highly educated accountant not justified in failure to timely file several years of tax returns). This rule applies with little or no force to a tax return due post-petition, however.

if the failure was justified, the trial court must first determine what records someone in like circumstances to [Defendant] would keep." *In re Sendecky*, 283 B.R. 760, 764 (8th Cir. BAP 2002). Courts look to a number of factors to determine whether the lack of recordkeeping was justified, including: the debtor's occupation; financial structure; education; business experience; sophistication; complexity, size, or volume of business; customary business practices for type and size of business; extent of any egregious conduct; courtroom demeanor; ability or knowledge to maintain bookkeeping system; extenuating or outside intervening circumstances; and any other circumstance that should be considered in the interest of justice. *See In re Strbac*, 235 B.R. 880, 882 (6th Cir. BAP 1999); *In re Sendecky*, 283 B.R. 760, 764 (8th Cir. BAP 2002); *In re Frommann*, 153 B.R. 113, 117 (Bankr. E.D.N.Y. 1993); *In re Devaul*, 318 B.R. 824, 838 (Bankr. N.D. Ohio 2004).

The Court finds that Defendant's failure to keep records for her defunct remodeling business was justified, based on her lack of education and sophistication, and the nature and extent of her business. Defendant was not a professional remodeler like Plaintiff. Her business was sporadic. She often provided services to friends or family. She was and is unsophisticated. She has not done much remodeling for several years. In addition, she does not make much money or have much in the way of assets and there is no allegation of unexplained loss of assets.

With respect to her bank and credit card records, the Court finds that Defendant made a good faith effort to obtain all such records and provide them to Plaintiff, and her failure to provide them was justified under the circumstances. There is no question the records are available; it is merely a matter of obtaining copies of them. Defendant's efforts in this regard fell short, but not so short that her discharge should be denied. Her failure to make complete copies of her bank statements was justified in light of her sophistication and ability, and intervening circumstances

likely prevented the complete production of the statements. To the extent it is relevant, her failure to produce bank and credit card statements was not caused by a desire to hide information, and there was no reason to suspect she was hiding lucrative transactions or valuable assets.

C. § 727(a)(4) (False Oath).

Plaintiff next argues that Defendant's discharge should be denied under § 727(a)(4) because she did not schedule the vacant Rio Rancho lot or the 1994 pickup truck. To prevail on a § 727(a)(4) claim Plaintiff must show that Defendant made a false statement under oath; she knew the statement was false; she made the statement with fraudulent intent; and the statement was material. *In re Mosley*, 501 B.R. 736, 742 (Bankr. D.N.M. 2013). *See also Gepner v. Kidd (In re Kidd)*, 2015 WL 6437480, *9 (10th Cir. BAP) (creditor must show that the debtor acted knowingly and fraudulently with respect to the misstatement or omission, and the misstatement or omission related to a material fact); *Estate of Bishop v. Mulholland (In re Mulholland),* 2011 WL 4352293, *4 (Bankr. D.N.M.) (omissions on schedules may be a false oath). "A debtor will not be denied discharge if a false statement is due to mere mistake or inadvertence. Moreover, an honest error or mere inaccuracy is not a proper basis for denial of discharge." *Gullickson v. Brown* (*In re Brown)*, 108 F.3d 1290, 1294-95 (10th Cir. 1997) (citation omitted).

The Court finds Defendant had no fraudulent intent when she omitted the pickup truck (valued at $325) from her Schedule B. The omission appears to be an innocent mistake.[12]

---

[12] The Court notes that the omission was material, even though the pickup truck is likely worthless, because of the low threshold for materiality. "The subject matter of a false oath is 'material,' and thus sufficient to bar discharge, if it bears a relationship to the bankrupt's business transactions or estate, or concerns the discovery of assets, business dealings, or the existence and disposition of his property." *In re Chalik*, 748 F.2d 616, 618 (11th Cir. 1984) (quoted in *In re Calder*, 907 F.2d 953, 956 (10th Cir. 1990)). However, the worthless value of the pickup truck makes it unlikely that Defendant *intended* to omit it from her schedules.
.

Similarly, the Court finds no fraudulent intent concerning the Rio Rancho lot. Defendant testified that she did not know the Webers had conveyed the lot to her. Given all the facts of this case, the Court finds the testimony plausible. The deed was signed November 25, 2014 and recorded the next day. Defendant filed her case six weeks later. Had she intended to hide the lot from her creditors, Defendant surely could have gotten the Webers to wait until after her case had been administered and closed. Furthermore, it does not appear that the lot has any value net of unpaid property taxes. It may be worth less than the 1994 Toyota pickup truck. The Chapter 7 trustee chose to abandon the lot rather than attempt to sell it. It defies logic to hide a worthless asset.

Courts often resort to "badges of fraud" to determine whether a debtor had fraudulent intent. *See, e.g., In re Garland*, 417 B.R. 805, 815 (10th Cir. BAP 2009) (listing ten badges of fraud, including prebankruptcy conversions, transfers to family members, insolvency caused by conversions, continued use of transferred property, and the value of the converted assets). Applying the badges of fraud in this case, the Court finds no indicia of fraud for either omitted asset.

D. § 727(a)(6) (Failure to Obey Court Order).

To prevail on a § 727(a)(6) claim, a plaintiff must show that the Court issued an order directed at the debtor; the order was lawful; the order did not require the debtor to respond to a material question or to testify; and the debtor refused to obey the order. *United States Trustee v. Standiferd (In re Standiferd)*, 2008 WL 5273690, *9 (Bankr. D.N.M.), *aff'd*, 641 F.3d 1209, 1212 (10th Cir. 2011) (citing *Gillman v. Green (In re Green)*, 335 B.R. 181, 183 (Bankr. D. Utah 2005)).

Here, the sole issue was whether Defendant refused to obey the Rule 2004 Order.

> Refusal to obey under 11 U.S.C. § 727(a)(6) requires "more than a mere failure to obey a lawful court order." *Green,* 335 B.R. at 184. Some degree of willfulness or

> volition on the part of the debtor not to obey the order must be present. *Id.* For this reason, inability to comply with the terms of an order can negate a claim under 11 U.S.C. § 727(a)(6). *See Morris v. Wright (In re Wright)*, 371 B.R. 472, 480 (Bankr. D. Kan. 2007) ("A debtor's inability to comply with the order, inadvertence, mistake, or impossibility will ordinarily be insufficient to revoke a debtor's discharge."). The party seeking a denial of discharge under 11 U.S .C. § 727(a)(6) must first demonstrate that the debtor received the order and failed to comply with its terms. *Jordan*, 521 F.3d at 433 (citations omitted). The debtor must then explain his or her reason for noncompliance. *Id.*

*Standiferd*, 2008 WL 5273690 at *9. Although the burden of production shifts to the debtor to explain noncompliance, the ultimate burden of persuasion remains on the Plaintiff. *In re Gardner*, 384 B.R. 654, 663 (Bankr. S.D.N.Y. 2008). The Plaintiff must "demonstrate some degree of volition or willfulness on the part of the Debtor." *Id.* at 670.

Defendant did not produce some of the bank and credit card records required by the Rule 2004 Order. Even after an initial production and three supplemental productions, Defendant fell short. Nevertheless, based on the totality of the circumstances the Court finds that Defendant did not willfully refuse to obey the order. Rather, Defendant made a good faith effort to provide the requested documents, and made four separate productions. She went to her banks to get copies of two years of bank statements. A copying error occurred at some point, and not all bank statements were provided to Plaintiff. It is clear Defendant did not know she failed to provide all of the requested documents. A mere failure to comply with the order, based on inadvertence or mistake, is not sufficient to deny the discharge. *In re Matos*, 267 F. App'x 884, 886-7 (11th Cir. 2008).

The Court notes that Plaintiff did not file a motion to compel or for entry of a civil contempt order. *See* FRBP 2004(c) and 2005(a); *In re Martinez*, 126 F. App'x. 890 (10th Cir. 2005); *In re Continuum Care Services, Inc.*, 375 B.R. 692 (Bankr. S.D. Fla. 2007). In the context of an alleged violation of what essentially is a discovery order, these alternatives are more reasonable than asking for a denial of discharge.

-17-
Case 15-01031-t    Doc 35    Filed 05/19/16    Entered 05/19/16 15:57:28 Page 17 of 18

III.    <u>CONCLUSION</u>

Plaintiff did not prove his claims under § 523(a)(2)(A) or §§ 727(a)(3), (4), and (6). The Court will enter a separate order denying the requested relief and granting Defendant a discharge.

_____
Honorable David T. Thuma
United States Bankruptcy Judge

Entered: May 19, 2016

Copies to:

Jason Michael Wexler
1212 Pennsylvania NE
Albuquerque, NM 87110

Michael K. Daniels
P.O. Box 1640
Albuquerque, NM 87103